May it please the court, my name is Michael Pollard and with me at the counsel table is Nicholas Kennedy. I represent the appellant Orthofix Inc.  This matter comes before the court after a bench trial and our client is asking the court to reverse the judgment entered by the district court on its breach of contract claim which is governed by Texas law and the misappropriation of trade secrets claim which is governed by Ohio law. In some sense this is a bit unusual because in this case the court issued a long memorandum opinion in order and the first 11 pages are replete with factual findings that you would think would lead to a conclusion where my client prevails on the breach of contract claim and the misappropriation of trade secret claim. I know the court has read the briefs and is familiar with the opinion but I would like to just reiterate a couple of those factual findings. For example, at page one of the opinion the district court found that the defendant along with Mr. Lemansky plotted their escape with the help of Orthofix's competitor over the course of several months taking with them sales information. Along with the competitor they concocted a plan to avoid legal issues. Mr. Hunter quit at midnight and started with the competitor at 8 in the morning and there was a stab in the back. You get the sense. Counsel, can you hear me? I can, your honor, yes. Any of those facts disputed? We don't dispute anything in the findings of fact. The first 11 pages we don't dispute. We accept all of those. And that's why it's a little unusual because we come before the court suggesting a de novo standard of review because we believe that the court made three outcome determinative legal errors, all of which are found in the conclusions of law, two of which pertain to the breach of contract claim and one of which pertains to the trade secret claim. Are there any disputed facts in the case where the parties on a factual issue are in conflict or are the basic facts of the case accepted and then the question is what should be done about it as a legal matter? For my purposes as the appellant, I accept everything in the findings of fact, the first 11 pages of the opinion. I don't accept things contained in the conclusions of law. The two errors that infected the breach of contract award, let me begin with what is probably the most obvious and simplest one. And this is found at page 17 of the district court's order. At that page, the district court, and we're talking about a nondisclosure provision under Texas law. The court states without any citation to authority, the nondisclosure provision here becomes a lifetime noncompete clause without limitation to time or geography and would be unenforceable under Texas law. That actually is an incorrect statement of Texas law. In fact, Texas law is to the contrary. The Texas Business and Commerce Act code section 1551C is the source of any requirement for temporal or geographic limitations. And the Supreme Court of Texas in the Marsh case held that agreements not to disclose confidential information are not governed by the act. Likewise, a Texas appellate court decision held that we find no Texas case requiring that enforceable nondisclosure covenants contain time, geographical, or scope of activity restrictions. And the reason for that is under Texas law, nondisclosure agreements and covenants not to compete protect separate interests. And in fact, two courts, Zepp and the Burke case, which is 2009 U.S. District Lexis 50221, have held that nondisclosure agreements will be enforced even if a noncompete or nonsolicitation covenant is otherwise invalid or enforceable. Here the court reformed the covenant not to compete, tried to do the same thing here, but as we've just pointed out, that was improper. Go ahead. Mr. Pollard, is there any different relief that's available to you under either the trade secrets claim or the violation of the nondisclosure clause claim? The only difference would be that under the nondisclosure provision, there would potentially be an entitlement to attorney's fees. I thought you also got attorney fees under the Trade Secrets Act too. I don't believe we do. You don't? Okay. All right. So the relief is the same under both clauses except for attorney fees. Right. On the trade secrets claim, you started out by saying that this case seems to be in a somewhat of unusual posture vis-a-vis fact-finding or conclusions of law. You want de novo review. What do you do or what do you suggest that we do with our NME case? It's a public case. It says that only in an extreme case, the determination represents a question for the jury. Now, of course, this was a bench trial, but in that case, the district judge on fact-finding was sitting in place of the jury. Correct. It seems to be counterintuitive, but Ohio law seems to say it's a fact question. I agree with you that it's counterintuitive. In this area of the law, there's a lot of typicallys and generalys, and I don't disagree that typically the issue of reasonableness of protection is a question of fact. Where I think the court went wrong here on the trade secrets is in its application of law setting forth what the standard of reasonableness is. And if I may call your attention to the exact place in the opinion where that happened, I believe it's page 12 of the district court opinion where the court used the phrase, they need to take affirmative steps or positive steps, and the court didn't talk about the reasonableness of the steps. And so, as a result, in this case... They didn't talk about the reasonableness of the steps. He found, as a matter of fact, that they weren't reasonable, right? Only because he said you needed to take affirmative steps, call it back. But this court in Heartland, in a case involving the interpretation of the trade secret statute, cautioned. And the court did the same thing, found unreasonable active steps. And this court said, no, even though we affirm, we're going to point out that the steps here, which were basically a confidentiality agreement and some password protection, were reasonable under the circumstances. And as we pointed out in the brief and all of the cases pointed out, no Ohio case that we have found has found a lack of reasonable protective measures when there is a confidentiality agreement. Here, there's much more than a confidentiality agreement. There's a confidentiality agreement. There's some password protection. The district court and the findings of fact said that everybody was supposed to hold this information close to their chest. There was a code of conduct. And there was an employee handbook. I don't think that this court interpreting Ohio law should be the first court to affirm a finding of unreasonableness where there has been an employee handbook when no other court that we've seen in Ohio has done that. So I think the court misconstrued the language active steps to assert a standard that was impermissibly higher than that which is set forth under the Ohio statute. Do you also read all of that as the judge elsewhere clearly indicating the appropriate standard of reasonableness and then making certain findings of fact and then coming to the conclusion that the conduct wasn't reasonable? I mean, it seems like one of the big factors is that they didn't ask for the book back. And no other case has ever held that to be insufficient in light of everything else that was present here. But it's all a matter of facts. I mean, the judge looked at all the facts and circumstances. You want to say that as a matter of law, what the judge found was sufficient, was reasonable? Well, alternatively, if you're not going to apply the de novo standard, my fallback position is finding of reasonableness is contrary to the evidence, yes. That would be a fallback position. But I do think it's a misapplication of a legal standard. But is it your position that as a matter of law, the actions taken by your client were reasonable as a matter of law? Yes, Your Honor, I do. But you don't have any case that says that. You just simply say if you were to hold this, you'd be the first case to say if you didn't do this, the result is that. Yes, no other court in Ohio has ever gotten rid of a confidentiality agreement as an adequate protective measure. In fact, the district court, in trying to do that, they had to get rid of this nondisclosure agreement and turn to Georgia law, the Equifax case. So there was no Ohio authority supported for his application of the standard. Had to go to Georgia law. And, in fact, the Equifax case is distinguishable on lots of bases. In that case, there was an agreement described as a pro forma agreement. It applied to all employees. Here there were only sales employees. There's nothing pro forma about this agreement. Mr. Hunter reviewed it with an attorney. He underlined the word confidentiality. He spent months trying to figure out how to get around it. In Equifax, they explicitly excluded customer lists from the definition of confidential information, which is what they sought to protect. So I think the court's resort to a Georgia case to strike this is inconsistent with Ohio law in light of the uniform body of Ohio law that we cited. I also think that the trade secret and breach of contract cases need to be decided differently, that even if the court rules against the trade secret case, it has to consider fully on its merits the contract case. Thank you very much. Thank you. Ms. Sullivan. Ms. Sullivan. Good afternoon to the panel. These glasses are on the floor right under your table there. My name is Lisa Sullivan, and with me at council table is Michael Filippi, and we represent the appellant in this matter. This panel- You represent the- Appellant? Oh, sorry. I'm a police. Sorry, Your Honors. I would do a very bad job arguing for the appellant. This panel should affirm Judge Zuhari in this matter because the customer information that's at issue in this dispute was never secret in the first place, and OrthoVix didn't do anything to keep it secret in the second place. And those two facts- When you start out with such a sweeping generalization, you attract our attention right out of the box. You're saying that the internal sales information was never secret? Seriously? OrthoVix just publishes for the world who they're selling to what amount? That can't be true. They certainly don't publish what they're selling and what amount. However, the evidence at trial- So why don't we say that there might be some information that wasn't secret and there might be some that is? Would that be a more reasonable approach here? Not for what the information that OrthoVix contends was its playbook information because that consisted largely of general knowledge, skills, and experience, and that was Judge Zuhari's factual finding that most of the playbook information was general knowledge, skills, and experience. Was there any factual dispute between the parties, one party saying this is a fact and the other party saying no, it's not a fact, that's false, as distinguished from what is sufficient as a matter of fact under the standard that the Act sets out? I didn't see that you and your colleagues in opposition were at loggerheads about a factual matter. With respect to the issues that are on appeal here today, which is the reasonableness of the measures that OrthoVix took, there are no disputed facts. If we look at other types of issues that were not central to Judge Zuhari's opinion, such as whether the playbook information was competitively valuable or not, certainly when we look at that, there are disputed issues of fact. However, they are not relevant to the appeal here today. The scheme here, if we can call it that, was that Hunter and his new employer gets in to visit the most profitable customers that OrthoVix has before OrthoVix can recover from this guy leaving them and make a pitch to retain the business. Is that a fair statement? The scheme, if you will, was that Mr. Hunter thought he had figured out a way that he could join a competitor and abide by what he thought was a valid non-compete. By getting his colleague in to see the most valuable customers first before they could recover. Is that right or is that wrong? There are some facts that a couple customers were visited, but no, there is not evidence that they went to all of the customers or all of the most profitable customers, Your Honor. Now, they at least picked off at least a couple of the most profitable ones. That would make sense in terms of prioritizing whose OrthoVix customers you're going to approach first, would it not? That would be a good scheme, but that's not what the evidence was, Your Honor. Well, you told me they did it at least for some of them. Now, where did the information come from as to which customers, if only a few, they would approach first? The information as to what customers that they would approach first is not in the record, but Mr. Hunter used his relationships that he had developed throughout his years. He also used the financial information that OrthoVix provided to Hunter that told him what he was selling to each client, right? No, Your Honor, because the evidence at trial was that DJO already knew who the largest customers were. That comes not only out of DJO's mouth, but it comes not only out of Mr. Hunter's mouth. It comes out of Chris Summers' mouth. It comes out of Jason Schellenberger's mouth. So they knew the amount of sales that were being made? The evidence is that everybody in the industry knows who the big customers are. You keep changing the question. I ask you, did they use the information of the sales, and you said, well, everybody knows who the big customers were. Okay. Let's assume that they knew that the guy that did 100 of these procedures probably earned more money for the company than the guy that did one. Okay, we get that. Did they use the actual sales volume information, the numbers that were produced by OrthoVix? No, Your Honor. I don't know how you could use information about sales volumes. Mr. Hunter didn't have information about sales volumes. I thought he was making the sales. He was making the sales. He doesn't know what sales he's making? Once he left OrthoVix, his access to the sales portal, which had revenue numbers, was terminated immediately. You're telling me that this record shows he didn't take into account the revenue information from his own customers as of the time he left? I'm saying I don't know how you distinguish between I know generally that this is a big customer who does a lot of surgeries and specific revenue information. We will freely admit that Mr. Hunter knew who the big volume customers were, but to take revenue information, there was no revenue information that was taken. There was knowledge of who big customers are, but that's very common in the industry. He didn't actually take it out of the computer system of the company, or is that what you mean when you say they didn't take? What do you mean, physically take the computer system with him, or what? I do mean that, but I also mean that Mr. Hunter could know in his head who the big customers were, but there was no way that he could memorize revenue information for all of the customers to be able to say, this customer is a $1 million customer, this customer is a $250,000 customer. Could he know who the biggest neurosurgeons were? So you're saying he took the book, but he never looked at it? Well, there is no book, Your Honor. That's one of the big points here. We went into trial, and OrthoVix talks about this playbook as if a playbook was a real, live thing, but the playbook is just what's in Mr. Hunter's head from developing relationships with his customers over the course of 10 years. So you're saying there was nothing to give back? There was nothing to give back other than what Mr. Hunter called the company and said, what should I give back, and they said, burn the patient health information. Okay, so it seems to me then that what you're saying is that the factual foundation for the trial court's ruling in your favor has absolutely no support, that there was nothing that they needed to ask for because there was nothing to give back, and therefore we should reverse. We certainly wouldn't want you to reverse, Your Honor. Let me read you a paragraph out of the district court order, if I may. Hunter and Lemansky met with Spina at an Italian restaurant in Southfield, Michigan, at which time they showed Spina their W-2 wage statement from OrthoVix and copies of their respective OrthoVix sales reports and discussed further their business plan for Metro Detroit. Spina asked Hunter and Lemansky for an account-by-account breakdown of their OrthoVix simulator sales, which Hunter and Lemansky provided. Is that true or not? That is an inaccurate finding based on the record. Accurate or inaccurate? Inaccurate, I'm sorry, Your Honor. The record evidence from Mr. Spina and Mr. Hunter was that Mr. Spina said, we think that Dr. So-and-so . . . So if I read the transcript, page 159 to 162, which is what's cited here, it's not going to say what Judge Suhari said it said? Correct, Your Honor. It says that Mr. Spina gave his ballpark estimates of what DJO thought it was and asked Hunter if that was close and that Mr. Hunter would say whether it was close or not. Are you defending this case on the basis that there was no breach? Are you conceding the issues that the plaintiffs have raised? We're not conceding any of the issues that the plaintiffs have raised. We would say that if Judge Suhari had reached the issue of breach, there was no evidence of breach. That's correct, Your Honor. However, we don't need to get that far because Judge Suhari was correct in finding that OrthoVix didn't take reasonable efforts to protect this playbook of information that was in Mr. Hunter's file. But if you look at his findings, the major finding, because he goes through a lot of findings that would support that it was protected, and then the major finding is that they didn't ask for something back that you maintain never existed to begin with. Judge Suhari focused actually on six different ways that OrthoVix failed to take efforts to take back the playbook, one of which was failure to ask for it back. But I thought there was no playbook. You told us there was no playbook. Right. However, if playbooks were as important to OrthoVix as OrthoVix now says they are, if they are actually the Bible of the business, then it is something one would expect OrthoVix would require its salespeople to put down in writing so that OrthoVix could maintain a copy of that. And I believe that's what Judge Suhari says. Well, let's talk about the sales portal and sales data. You can tell I'm sort of hung up on this. Sure. According to the opinion, each salesperson had their own portal. Is that true? Each person had their own password to the login information to the portal. Listen to the question. It says each person had his or her own portal. Is that true? The sales... If you don't know, say it. I don't know, Your Honor. It also says which was password protected. Correct. Is that true? That's correct. The portal was accessible only to the individual salesperson and the district sales manager. Is that true? That is not true, Your Honor. Again, it's cited to the transcript. Yes. And in preparing for argument today, Your Honors, I looked... So how would you better protect the sales information than what they did? Well, in this day and age, Your Honor, I have to enter a password to play Sudoku on my laptop. Today, in this day and age, when password protection has become more and more important, we might look to whether passwords were changed every 30 days, whether passwords met certain minimum specifications. Well, you might if it was a question of somebody stealing a password. That's not an issue here. Do you have any authority for the argument you're making? Yes, Your Honor. I think it comes from Your Honor yourself. In your Nieme case that you brought up earlier, Your Honor, you said the panel's task is not to compare or contrast the quantum and quality of the reasonable efforts taken, and it goes on to say later in that opinion, but to honor the fact finder's prerogative to determine reasonableness. It's always a question of fact whether they've done it or not. The fact finder made a number of facts, findings. Now you're saying that he got the fact findings wrong. Let alone that his determination of whether those facts were reasonable was wrong. No. Judge Zuhari weighed the facts correctly. I kind of thought you were going to be coming here supporting Zuhari. I am supporting Zuhari. You won. He is. I am, Your Honor, because the sales portal was password protected, and Judge Zuhari agreed with me that that was not the be-all and end-all. The sales portal did not have the vast majority of what was considered to be playbook information in the first place. That is what he says in his opinion. He also looked at the pro forma agreements, confidentiality agreements, and he weighed those against six other things that orthofix failed to do. One of them was Chris Summers, Mr. Hunter's supervisor's testimony, which was not from counsel. It was solicited by Judge Zuhari. He asked Mr. Summers, what did you do? Did you do anything? And Mr. Summers said, no, to answer your question, nothing was protected. So that's one other thing that Judge Zuhari relied on in his factual finding. Next, he looked to whether there was a central directive at orthofix, and that's on page 7166 of the transcript, that there was no central directive. No central what? Directive on the protection of playbook information. What's the significance or relevance that there was no central? Sure. Orthofix's position today on appeal is that the playbook is the most important thing to their business. It is the Bible, it is the be-all and end-all, and yet there is no directive at orthofix that says, here's what a playbook is, here's what you can do with it, here's what you can't do with it. It doesn't say you must put your playbook into writing. Are you saying that someone can work for a company as a salesperson calling on the trade for 10 years and accumulate all of the information that you might accumulate about how much sales you're making and a great deal of detail and then immediately go to work for the competition the next day and go back and call on the same trade as before? Yes, Your Honor. That's fine? Yes, Your Honor, I think that's fine. And where you've got a confidentiality agreement in there and we're governed by the Trade Secrets Act. I mean, where do you come with that idea? That idea comes from non-compete law and misappropriation of trade secrets law. You can go and compete so long as you're not using something that wasn't a trade secret in the first place. And here Judge Zuhari found... It doesn't have to be a trade secret under the confidentiality clause. No, but under Texas law it does have to be confidential and we cited case law in our brief to say that. And also that confidentiality clause cannot cross the line to act as a non-compete in sheep's clothing. I see I have 33 seconds left, Your Honor, so to sum up... You're saying there was no confidential information? There was no... The record supports that the evidence that they say is their playbook confidential information was the type of information that salespeople routinely gathered and that all of the competitors were able to get through their own... So you're saying there was no confidential information? Correct, Your Honor. I am. So a customer list, say then, if you're a stockholder, that wouldn't be confidential under your definition, would it? A customer list if you're a stockholder? Excuse me, if you're a stockbroker. I'm sorry. Well, I am out of time, but I will answer the question. A stockbroker list might be different because the names of the customers are not readily available by Googling them on the Internet or looking in a phone book, unlike the neurosurgeons and orthopedic surgeons in Toledo where all of the bone growth stimulator competitors know who the bone growth stimulator customers are. There's only about three dozen of them. But identifying them and knowing their buying habits are two very different things. They are, Your Honor. But the evidence at trial from, for example, Rebecca Lawhon, was that you get that information by going to the doctor and saying, do you believe in bone growth stimulators? Okay. Thank you, Your Honors. Thank you. Thank you, Your Honor. I'll be brief. With respect to the paragraph you read out of the opinion, we reviewed the transcript and we believe it fully supports everything the judge said that it said. In addition, on the lack of confidential information. Her argument seems at least in part to be there's a bunch of information. We'll just call it the playbook information. And because some of it or maybe even most of it could be easily obtained in other sources, therefore none of it is confidential or subject to the Trade Secrets Act. That just intuitively doesn't sound like that could be right? That because some is not, then all is not? That's correct. It's the compilation. Was there ever any parsing here of which of these various items of information was either a trade secret or confidential? The court asked our counsel. No, no. I understand he asked you a question. Right, right. And basically we said everything is both trade secret and confidential. We never said if this is trade secret, then you only assess this. That's not what I'm asking. Okay. Did the judge ever go through this various information and say trade secret, not trade secret, confidential, not confidential? It seems to me he never got to that point because he said it didn't meet the element of trade secret, meaning reasonable steps to keep confidential. That's correct. Doesn't mean it wouldn't otherwise have been a trade secret or confidential. That is absolutely correct. He describes the different elements at pages 9 and 10 of the opinion but does not go as far as Your Honor just suggested. So with that, Your Honor, I would suggest that the court reverse. Was there a playbook? A physical book? No. Was there information in a form other than in his brain? Sales portals, the information which, as Your Honor read, was displayed to Mr. Spina in advance of their departure, sure. So what could they have asked? Okay, these sales reports that he had, is that something that he was able to generate or is that something that they could have asked to get back physically? Are these things that he would have had anyway? Do you understand what I'm asking? I mean, the idea of asking him to give things back, were these reports that he had that you knew he had or was this sort of information that he had access to? This is information that is constantly updated, mostly by him. The sales data is frozen in time when he leaves, so when he shows them the sales data. On a computer? Is that where it is? A report, yes. And Mr. Spina, at those pages indicated. It's on a report but it's in a digital form? Yeah, print out of some sales information, computer generated. That's the most tactile of this. The other preferences, et cetera, a lot of that is in his head, but as we know, the memory rule doesn't apply. Okay, so how does... So you... No, go ahead. I'm just trying to... These reports, for instance. I'm trying to figure out how you would have gotten them back. If the information is digital and you cut off his access, right? Right. The court makes that finding, presumably because we cut off the access. Of course, the problem is he's already shown them to Spina in advance. Okay. So there isn't really... Did you know that? That is out of the bag. Did you know that? When did you find out that he had shown this information? As the case develops and you learn this information, but it's pretty obvious that when he quits at 12, 15 in the morning and begins seeing your big accounts the next morning that something has gone on. It took a little while to find it out. Now, Ms. Sullivan suggests, well, maybe they knew who the big customers were, but everybody knew that, and he only approached a couple of the larger volume doctors. Is that supported by the record? No. I think if you look at the page numbers that Your Honor just read out, what it's going to say is we kind of knew approximate volume, and when he gave us the sales information, it confirmed it. But, of course, he gave them the sales information. I mean, that has value in itself. Confirming something has value. But Judge Ushari says in that regard, it was in the best interest of each sales representative to keep his or her playbook, which is the information I'm gathering in my mind, close to the chest because if information contained in the playbook fell into the hands of a competitor, the representative could lose sales. Correct. And that's not only our people testifying to that. That's their people testifying to that. They don't want to give it to competitors. Am I right that the way they lost sales is not so much whether OrthoFix or the other company was better than the other. Hunter was able to put his people and his new employer in place to get to these doctors to switch them over before you could react to Hunter leaving. Is that essentially it? That's essentially correct. And that's the scheme that the district court found. Could I ask this question? Certainly. The fact that he was able to go in the next day and start calling on the customers that he had called on in the past and get the business away, which reduced substantially the business of the company he had been working for, was based primarily on his knowledge and his personal relations with the customers that he had established. Is that more or less correct? Absolutely. It gave him a head start before OrthoFix could ever recover. But that's not necessarily a trade secret. I mean, a good salesperson develops relationships, and they don't have to give those relationships up. That's more of a non-compete issue. It's a non-disclosure issue when you also know whether this physician is a believer or non-believer, what types of procedures he uses these for, who's got the greatest potential for growth. That's all he knows. And it leads to the assault on us through the competitor. There are several factors involved. One is a friendly personal sales relationship with a customer. The other is knowing a lot about his business, which gives rise to that relationship. So there are a number of different things involved, personality, information, and so on. I'm sure he's a fine salesman, and he can go sell bone growth stimulators elsewhere in Ohio. He just had all this information about 50 doctors. That's it. Thank you, Your Honor. I'd ask that you reverse. All right. Thank you. The case will be submitted. Please call the next case.